Argument No. 204014, Vieira v. United States Mr. Chodkamp, whenever you're ready. Thank you. Good morning. May it please the Court. Stephen Chodkamp, IV, Defendant, Accomplice to Government. The foundationary liability in this case was that in August 2015, Melissa Avilez acquired ultrasounds of the right breast. It is undisputed that Ms. Avilez received ultrasounds of the right breast in August 2015. This is part of ongoing specialist care. Yet the District Court found Urban Health liable based on a hypothetical three-step causal chain, which no court had advanced and which was not supported by the evidence First, the Court assumed that head nurse midwife Karen Acosta discussed Ms. Avilez's breast health on August 25th, that she would afford her an ultrasound, even though Ms. Avilez was still awaiting the results of one taken just days earlier. Second, the Court assumed that this duplicative test would have gone ahead in September, even though just six days later, on October 31st, the Surgical Department told Ms. Avilez that her newly available results were benign and that she should retest in November. And finally, the Court assumed that a hypothetical September scan would have found materially different results than the benign August one, even though no expert evidence supported that conclusion. Because the record reasonably permitted only one conclusion as a matter of law, Urban Health could not approximately cause any delay in Ms. Avilez's care. The judgment below should be reversed. I'm sorry, so can I ask, being that we know that Ms. Avilez was inconsistent in terms of what she told her providers, and for example, we know that she didn't tell Bronx-Lebanon about a referral that she'd had from Urban Health, why is that not sufficient for the District Court to have found that one of the possibilities was that Acosta would not have even heard about this? Heard about what? Heard about the other ultrasound. She didn't tell Acosta about her breast pain. What we have in the record is a woman who doesn't share all of the information with all of her providers. So why isn't that information sufficient for at least one of the possible outcomes that she would have never told Acosta about her upcoming scan? Well, I think you're almost correct that that's one possibility of what could have happened, but the standard is for the court to find as a matter of law of liability, the possibility that it relied on is actually supported by permanent facts in the record as opposed to a theoretical possibility. No, but they had in the record, right? The District Court knew that she didn't tell Bronx-Lebanon about the Urban Health referral for the ultrasound. The District Court knew that she didn't volunteer to Acosta, that she was experiencing breast pain. The District Court knew that she had to go see Bronx-Lebanon four times before she was told about the fact that her son had elbowed her. So the District Court did know that she was a woman that didn't share information. And so, again, I ask, why isn't that information sufficient for at least one of the potential alternatives, which we have to defer to the District Court to find out, to have been that Acosta would have never learned about this upcoming ultrasound? My response to that, Your Honor, is that particular engagement with what could have happened, what may have happened, what in fact is more likely than not to have happened, is entirely missing from the District Court's analysis. You're right. The District Court knew that she had this history of not reporting symptoms to all the providers. In fact, the record shows that she's been seeing Bronx-Lebanon specifically about her breasts since June of that year, which may be one reason she's not discussing it with Acosta, since she is seeing Bronx-Lebanon hospital surgeons about it. So the Court knew that, correct? But what the Court did, and this is on page 26 of the lower court opinion in the special appendix, it just assumed an ultrasound would go ahead. I told you, Your Honor, that that's a possibility. But she was the fact finder. She was the one that assessed the evidence, listened to the four different experts, listened to the seven different witnesses, read all the three different deposition testimony, and she concluded that it was reasonable to presume that what happened between those two people might not have led to Acosta ever finding out about this ultrasound. And we have to be deferential to what the finder of fact had in that circumstance. And again, I ask the question, why aren't those data points sufficient for the District Court to reach the factual determination about what would have happened between two people? So what I would point the Court to is the penalty part, which is a decision that is directly analogous, where the First Department said, in this exact situation, a plaintiff alleged that an oncologist failed to inquire about a particular, you know, health-related issue. And the Court said, yes, there was – even if there was a breach of standards here, we still need to establish that there was a causal nexus that that would have led to a different result. And there, the First Department said, the only reasonable inference is a matter of law in that situation is, yes, had the oncologist inquired about her, he would have found out on that date that she had gotten these tests from the specialists who were treating this condition, and all that person reasonably could have done is refer that person back to that existing test. That is analogous to the facts here. So I don't think the question – Well, but I – May I just straighten out a detail of fact? It's my understanding – and correct, please correct me if I'm wrong – it's my understanding that the – at the time that she visited U.H. at this – at the incident that we're talking about, which was on August 25th, the ultrasound at Bronx-Lebanon had already been taken six days before. It was not a future ultrasound. It was six days earlier, on the 19th of August. Am I correct or incorrect? That's correct, but the results were not known. The results were not known, but the test had been taken. So it's not that she – it's not that she might not have reported that there was a – she was scheduled for a future ultrasound. It's that the possibility is, if she was told, well, I think you should have an ultrasound, wouldn't she have said, I just had one six days ago? That's the – that's the issue. I think that's the only reasonable inference. You know, if she inquired, as Well, I just had an ultrasound six days ago. Oh, what did it say? Actually, I don't know yet. The results aren't out yet. But didn't DaCosta say that even if she had gotten a negative ultrasound, she still would have referred her? She said she would have referred her to a doctor. Right, and didn't the expert that was before the district court judge say that the appropriate standard of care when referring someone to a doctor would have been to that the six-day earlier ultrasound had come back negative, she still would have referred her? Is that not correct? And wasn't that before the district court? That wasn't the testimony. The testimony was the standard of care – and no one disputed this point, the board of defendants experts. The standard of care is, if there is a complaint related to the breast, the first step is usually an ultrasound. Now, in fact, at trial, you know, plaintiffs attempted to argue that actually it was a non-devised episodic trial, and no one doubted that the first step is get an ultrasound. What DaCosta said was, depending on the timing of that ultrasound, the radiologist will say, hey, maybe you should follow up with a doctor, and no one doubts that if there's anything maybe suspicious in the ultrasound, it's not the gynecologist or the nurse midwife that's going to set a further plan of care, it's obviously the record, this is your further plan of care, and your results that came back today are benign. We think you should come back in November for your next test as a result. A test that she for whatever reason often misses. So in light of all those facts, what we're saying is it was not a reasonable inference from the court just to assume that DaCosta would have ordered an ultrasound, that it would have taken place specifically in September, and that it would have shown somehow different results from what the doctor said. So is it, I guess as a factual matter, is it that Ms. Avila would have said, I just had one six days ago, or is it that they would have gone into some central queue to have a test and that would have been found out then? I guess I'm just not sure factually how that would have worked. It was a third-party defendant. I don't think there's a centralized computer system between the two, but the test was pending as of that date. You mean the results were pending? Sorry, yes, the results were pending. So if she didn't say anything, then there's nothing in the systems that would have communicated to identify that there's already a pending test. Correct. So, and that's the basis for the district was finding that she should have inquired about the test, which for purposes of appeal, we don't contest. It's just as a logical matter, you know, breach isn't enough. You have to show a causal nexus that what you're saying the provider should have done in the context of the actual care and other care being provided, not in a vacuum. Would that as a logical matter have actually changed the outcome? There are a series of hypothetical leaps that the court had to take to get there, none of which actually is premised on probative facts in the record that allow that inference. Well, another one of the court's leaps was lest the ultrasound that would have been ordered hypothetically by the facility come out the same as the one at Bronx-Lebanon, the court said, well, it wouldn't have been taken for several weeks, giving time for the cancer to develop further and be more detectable, because otherwise the more likely result is that the ultrasound taken on or very soon after the 25th of August would have shown the same as the ultrasound taken on the 19th of August. That's correct, Your Honor. And, you know, the first report's a look at pages 26 through 28 of Rule 13, which is the relevant portion. There's citations and nothing to support the assumption that it would take place in September. It's stated as a fact in the report, but no expert testified that given these facts a September ultrasound was necessary or required. I agree, but the district court, again, had some information, right? The first time she got a referral from Urban Health it was scheduled three days later. She had an October provider visit, and then the ultrasound was scheduled in November. She had an incident where the provider was scheduled in February, and then it happened in July. So, like, I think the bigger question for us is, had one happened in September, would it have been big enough to have been detected? And I believe that even your expert said, given how aggressive this cancer was, that it would have been. Is that correct? Can I ask you one more question, Your Honor? Please. So the first question about September, that's precisely her point. There are all these data points. The May visit, she gets an ultrasound that day. The June visit, they schedule one for July. She misses it. She comes back in August. The August ultrasound, after that, the health providers, the surgeons tell her, come back in three months. All these data points about when a provider actually would have said about when this ultrasound is, this report didn't make any of that. It just said, well, it's reasonable it would have happened in September. But as this court said, and the evidence needs to be pawned, speculation can be reasonable. It's theoretically possible. But unless you tie that and synthesize it with the other facts in the record to show that that's actually more likely than not, it's still reasonable speculation, and that's not sufficient to support planning and pliability. As to the point about what a September ultrasound would have shown, what our expert said in his testimony is that the way that, and he, by the way, is one of the few physicians in the country that treats this very rare disease, and his was the only competent expert testimony. He said that the way that this disease is typically detected or diagnosed is something incidental happens on an ultrasound, for instance, which may be not obviously malignant, but suspicious, that might lead to an MRI, that might lead to a biopsy, that catches this. That's precisely what happened in March 2016, of course. So what he said was, you know, the cancer itself is likely reversed there starting in September. He never said an ultrasound in September would have detected this cancer. I mean, in fact, we saw in the August ultrasound, they found some odd tissue. They said this is benign. It looks like traumatic tissue change, but come back in three months, right? That's one day report. We know that in March 2016, she comes back, finally, and it's a Fyre-S3 result, probably benign, which leads to this path that our expert described. What this report just assumes, with that being the expert testimony, is if a September ultrasound occurred, it would have been more like the March 2016 one than the August 2015 one, which happened just weeks before. The court, respectively, did not have a basis to say that. Well, I guess I'm sorry I'm confused, but didn't your own expert say that in September 2015, six before March 2016, it would have been detectable? He never said detectable by ultrasound. That process, the question that he answered, which wasn't included in the plaintiff's brief was, when was the cancer first there? It wasn't a question of when would an ultrasound catch it. That's a very different question. And that was a topic that was discussed at length by the doctor in his testimony. The way you catch this is, incidentally, an ultrasound might pick up something that leads to an MRI that leads to this other thing. So the question he was answering was, more likely than not, starting in September is when the cancerous cells were there. That's a very different matter from him saying an ultrasound in September would have led to his cancer. May I ask you another question, please? The district court found the plaintiff 50% responsible through her own negligence. By my count, there were six instances, six different instances, in which the woman, Melinda, failed to act reasonably for her own protection. Six instances in which she was negligent. In five of those six, as I see it, she failed to follow recommendations to have tests taken and steps taken that would have protected her. Is it a fair assessment by the district court? Is it reasonable to ascribe to her only 50% of responsibility, even assuming that it was correct with respect to the UH, the defendant's responsibility? Is it fair to attribute only 50% to the plaintiff in view of six different instances of her failure to look out for her own health? Well, you're right. You know, that was the determination of the district court, and that was the actual determination of the legal conclusion, and we don't challenge 50% apportionment for the purposes of the appeal, of course, but I think for purposes of answering the question of her health liability, what's important is one of those, well, two of those missed appointments occurred in this time frame. She missed the July ultrasound, and she missed the November ultrasound. We're talking about a hypothetical September ultrasound. Would that have gone forward? It is, of course, irrelevant, and the court, I think, district court could and should have engaged with this before assuming September 1 would have gone forward, and she herself finds, you know, this patient unfortunately has a history of missing appointments. That's certainly relevant to deciding, you know, assuming without citations or other evidence, well, September 1 would have gone forward to release the neon for her. And so that, you know, regardless of what the apportionment is, it's a very tragic case, that's the critical point, I think, in terms of can we find appropriate health providers there? Why do we put the other 50%? I see I'm kind of gasping for my time. Thank you, counsel. You've reserved a few minutes for rebuttal. We'll hear from Mr. Landers. May it please the court, my name is Benjamin Landers. I represent the appellee, Judy Vieira, who is sitting in the back of the court room in a new capacity as executor of the estate of Melissa Aviles. I want to be very brief and very succinct and just start with several things that are totally undisputed. Undisputed. It's undisputed or undisputed that Melissa Aviles was 26 years old and the mother of a 4-year-old when she complained, not once, but twice, to urban health providers, once in December 16, 2014, and once on February 28, 2015, of both a lump and pain in her right breast. That's not disputed. It is also undisputed that she was seen by Karen Angus Costa, a certified nurse midwife at urban health, on August 25, 2015. And the record is clear that this is labeled an annual gynecological exam. Now, an ultrasound had been ordered a couple of months before this annual gynecological exam for whatever reason, whether a male wasn't delivered to a large apartment house or whatever reason, that wasn't done. But we have a woman here who's complained twice of pain in her right breast and a lump in her right breast. And at the annual exam, the certified nurse midwife doesn't take the 30 seconds to palpate her breast and see if anything's there. She also doesn't reorder the ultrasound, which has been ordered by another urban health employer. And finally, it is not disputed by the government that just... I'm sorry. An ultrasound, not which had been ordered, which had been taken six days before. You are not... I did not make clear. An ultrasound was ordered by another certified nurse midwife several months before, a fellow named Santiago. The testimony that came out through definitions and trial was that that ultrasound, another person at urban health was supposed to send a letter and tell the person, you need an ultrasound. Don't get it. Here's a prescription. That was never received with the testimony from this appealist herself before she died. And the same testimony by Mr. Vieira. That ultrasound was never done. The one from several months before, when Santiago saw her in February, when she complained of things in her life. And didn't one of the experts testify that had the appropriate standard of care been given, the provider would have looked and seen that there was an ultrasound that had been ordered but had not been completed, and therefore another ultrasound and a referral should have happened? Absolutely. Judge Parker found two departures from the standard of care. That the ultrasound that was never taken was not reordered at this annual gynecological exam. And that they never did a routine breast exam. Now, I want to mention something, which during the 10 or 15 minutes my adversary argued, was not brought up by me in a similar report. The record is clear that a lump in Mr. Villas' right breast was palpated. That means felt. And all the experts said, for a lump to be felt, it has to be at least a couple of centimeters big. Okay? That was six days before the class disorder. It was in late August of 2015. Now if, in order to palpate a lump, it has to be several centimeters big, without question, all of the experts agreed, if you can palpate a lump, it's mandatory that you get an ultrasound. So what Judge Parker astutely said was, in her rationale, if she had examined her and done a routine breast exam at this annual gynecological exam on a woman who had twice complained of breast pain and a lump, she would have felt it. And that mandates another ultrasound. Could you address the three steps the government sort of laid out in terms of the assumptions that went into the district court's conclusion of approximate cause? The only preface I'm going to give to that is what this black letter would imply to everyone who's sitting in the courtroom should know, that the only way that a finding of fact could be reversed at this level is if it's clearly erroneous. That's right in the federal rules of civil procedure. Justice Parker said, based on the testimony, since this lump was palpated, it mandated that there be an ultrasound. If an ultrasound hadn't been done, given that it was palpated, certainly the ultrasound would have shown, and in her words, if there was a lot of testimony about how this grows, it would have shown something of sufficient size, since it has to be several centimeters to be palpated, that it would have necessitated that a further test be done, namely an MRI, which, by the way, the testimony is unequivocal, you can pick up a lump as small as two millimeters. I'm not sure... Sorry to interrupt. I'm not sure you're responding to my question. I'm going to try to do so. Okay. Justice Parker, in finding causation in this case, which is also a question of fact, as cited by all New York public courts, says that had an ultrasound been done... Well, I guess that's the first... Let me just break it down, then. That's the first one is, would she not have said, I just had an ultrasound six days ago? Why would a second one have been done six days later? Justice Parker didn't speak to that. The answer to the question is, if you go, and let's take this woman as we find her, you go to a health care provider, and they say, I found a lump. I can feel it. This mandates follow-up care. That person is not going to turn around and say to the certified nurse of New York, well, I don't want another test. I have this test. I think what they're going to say is, you tell me you found it, and I have to have another ultrasound. Well, let's do it. Let's take care of the driver. Now... The district court didn't speak to this possibility one way or another, as far as I can tell. Is that fair? No. She specifically says in her findings, and I'll read you the exact quote. She said that, based on the testimony of all the experts, this tumor was between 3 and 5 centimeters between September 20, 2015, and February 2016. All experts agree that complete recovery occurs 50 to 59% of the time when the tumor is treated before it's 5 centimeters. On that basis, I find, quote, certified nurse Midwife Picasso's failure to conduct a physical exam and follow-up on a missed ultrasound approximately caused Ms. Avila's to suffer a loss of chance of surviving her cancer. New York courts on the issue of immunization have, for the last 45 years... How does that address... I'm not sure. How does that address the issue raised by Judge Park's question, which is that if Nurse DaCosta had done what she should have done  she would have learned from the patient that just six days before at another facility an ultrasound had been done and the results were being awaited. That's sheer speculation of what the patient would have said. And I don't think a good healthcare provider is going to say, OK, we'll do nothing because somebody else may have ordered a test. They would say, I believe, OK, I want this done. I don't care what's going on elsewhere. And I think it's sheer speculation. And according to you, Judge LaValle, you said, well, this woman, and Judge Ferris, this woman had a history of not telling people that, well, maybe I'm not so happy here so I went elsewhere. She's trying to get the best care she can. It's sheer speculation that she would have said that she had an ultrasound and she's waiting for results. And what I think is less than speculation but is a certainty... A good healthcare provider wants to take care of the patient right there. Not that she's going to say, well, I'll wait for a result from somewhere else. And their own experts said the reading of that Bronx-Lebanon ultrasound came out 5 inch 2 and their expert admitted that can very easily be 5 inch 3, which absolutely requires an MRI which would have fixed this up. I think what's really important here, I think this whole appeal comes down to one sentence. And here it is. Justice Parker listened to all the experts, listened to all the testimony, made a finding of fact that not only was there a departure but based on the totality of the findings that causation existed. That's Judge Parker's finding of fact. Causation is a finding of fact. This court cannot overturn that unless you find it clearly erroneous. It's nothing close to clearly erroneous. Or based on speculation. Excuse me, sir? Or based on speculation. I'm going to say one last word which I thought about starting this argument with but I'll end it with it. You ask trial lawyers what they want in a judge. I've been doing this 45 and a half years and the answer is, just like a teacher, you want a fair trial and a judge will let you present your case. Trying this case in front of Judge Parker, that was an absolute privilege because she is an extremely intelligent woman. Let's judge. That's a better word. She's extremely intelligent of a judge. She lets you try your case and then she wrote a 26-page decision outlining the facts she found. I think, without a doubt, that fact-finding was not clearly erroneous. I think her court decision should be affirmed. Thank you. Okay, thank you. We'll hear rebuttal. Just a few points, Your Honor. First, it's cornered with New York law that causation can be determined and should be determined as a matter of law if the record establishes only one reasonable conclusion. Therefore, just as on the review of summary judgment, it is a no-vote legal question that this court should review. Second, Mr. Landers brought up December 2014 and May 2015 visits and whether or not, you know, ultrasound should have been done in that period. I'll say a couple things about that. The district court concluded that the standard of care was met in those visits, that no provider had a duty to chase after his adolescent to get an ultrasound in that period. Plaintiff did not appeal that determination. And I'll point out, the record is undisputed that in that period, between May and August 25th, she had two ultrasounds done at Bronx Clinic Hospital by surgical department specialists who were setting a plan of care for her to find any potential problem with breast. Okay, I want to get back to, if we can, a conversation that we had earlier with respect to whether or not DaCosta deviated from the standard of care. And I actually found in the record J91, where the question was posed to her. So, what if for the case that you got an ultrasound result back from the radiologist that said negative but the patient still complained of a breast pain or mass to you? What would you do in that situation? Answer, in that situation, if she continues to complain of continued pain, you refer them to a breast specialist. And so, I'm interested in hearing how, with DaCosta's own admission that had she done the barest minimum of asking how she was doing in response to the two other times she complained, how we would not have ended up with an ultrasound or at least a referral to a doctor. Certainly. Well, the answer she gave to that is if you have a negative ultrasound and yet the patient is still complaining, what would happen? How do we know what would happen in that case? Do you know? Because she got the results six days later and that exact fact hadn't happened. And what did the specialists do? They didn't order another ultrasound right away, just in case. They said, okay, well, we'll monitor you. Come back in November. Well, I guess the point is, though, isn't another way of interpreting that is that that wouldn't have mattered, right? If she had known the results of the ones that were six days earlier, it wouldn't have mattered because had the patient still been complaining of pain, she would have ordered yet another ultrasound. I mean, isn't that what she said? Isn't that what she testified to? Well, she wasn't giving the fact pattern where if a patient is already seeing the appropriate specialist who you would refer her to anyway, and that's what she testified to, I'm a gynecological nurse midwife. It's a radiologist and a surgeon who needs diagnosis instead of cancer. She was never faced with the question if you had a patient... Right, because she didn't ask anything, right? She didn't ask anything. No, and we're not disputing the standard of care. Okay, so you're not disputing that she failed in the standard of care. So the extent that the court said that she failed to inquire about her breast health as it reached the standard of care for purposes of appeal, we don't contest that. But what the court did after that is still an element of a court claim, which is even after that breach, could that be a material difference? In that step, the court just assumed that it all just now would happen instead of engaging with the appropriate facts in the record to determine is that more likely than not what actually would have occurred? Well, I think she did. I mean, respectfully, I think she did, and she just came up with a different conclusion that you did, right? I mean, there is evidence in the record that she might not have learned about the upcoming ultrasound. There's evidence, at least some evidence, that in September it would have been detectable. There's evidence that the record, that the ultrasound could have been scheduled as soon as three days later. What I would say, Your Honor, is this is not a question of saying that the court got the credibility inferences or weight-bearing wrong. Obviously, that would be a different question. What we're saying is I don't think the court actually did an appropriate analysis of if you were in Ms. Avila's position on that date, you know, six days after this encounter, which, you know, the court found deficiency. But putting yourself in Ms. Avila's shoes, six days later, you go to the actual people you've been seeing for two months now to cure this or to catch whatever might be going on in your breast, and they tell you in no uncertain terms the test you just got is benign. Come back in three months, and we'll follow up. There's no analysis of why a patient in that position would say, well, you know, this nurse told me also to get an ultrasound, so I'll do that specifically two or three weeks from now anyway. You know, that's the difference between saying this is just one of two options the court plausibly could have chosen from versus the court saying this might have happened and it's certainly reasonable when it happened, but there's just total failure of engaging with how that actually gels with other facts on the record. And that is, under any standard, you know, it was there. It seems to me that this would be a very good case to mediate. As I see it, speaking for myself alone, on the one side, I think there are very strong arguments that could result in overturning the district court's decision, and there are also very strong arguments that could result in affirming the district court's decision. Both sides have a great deal at stake here. I think an unbiased observer would have, hearing the argument made today, would have difficulty concluding how this panel is going to come out, and I don't know, except from what you've seen, I don't know how my colleagues will vote. I'm not sure I know how I will vote, but I think there's a lot potentially to be gained by seeking a settlement through mediation. So I wonder if the—I gather you wanted to address that? You did have a mandatory mediation. Yes. Yes, that was then and this is now. Are you saying that there's no likelihood that there would be any give on your side, that there's nothing to mediate? I'm saying that the— Well, the government may think otherwise after having heard the questions of the panel and considered the landscape anew. So I think if my colleagues and the presiding judge are amenable to this, I think— Yes, please. So I think we will direct that you mediate, you go to camp, go to camp to mediate the case, and let's say for three weeks and we would hold off deciding the case for three weeks and after three weeks you would report to us whether there has been a settlement or not and if there has been no settlement, we will proceed to decide the case. If there has been, we won't. May I just address that point? Yes. Well, the government said they can offer any good faith and, you know, as is our obligation in any case, we engage with the parties on any reasonable settlement. That's an obligation on us. That is a special litigant and we take that very seriously and it is one that we are always pursuing in this case. So I just wanted to make that clear. Well, that's fine. Nobody is compelled under any circumstances to settle a case. And so both sides will go in good faith to camp, engage in the mediation. It doesn't mean anybody has to agree to anything and report back to us in three weeks and if you haven't settled it, we will decide the case. Thank you, Your Honor. All right. Thank you. Thank you both. That concludes our arguments for today. The remaining two cases on the calendar are on submission. So I'll ask the courtroom deputies to adjourn.